**UNITED STATES ex rel. HARGIS v. MARYLAND CASUALTY CO. et al.**

No. 4589.

District Court, S. D. California.
Central Division.

Feb. 21, 1946.

Alfred E. Rogers, of Los Angeles, Cal., for plaintiff.

Vernon F. Gant, of Modesto, Cal., for defendants.

YANKWICH, District Judge.

On September 21, 1943, M. J. Ruddy, Sr., and M. J. Ruddy, Jr., comprising the partnership of Ruddy and Son, entered into a contract with the United States of America for performing certain public works, namely, air field facilities at the Materials Test Base, Muroc, California. The contract which was duly executed by the contracting parties, bears the designation and number of W–509 eng 5584.

The contractor executed a bond under the provisions of 40 U.S.C.A. § 270a—known as the Miller Act—with themselves as principals and the defendant Maryland Casualty Company, a Maryland corporation, as surety. In the performance of this contract, the contractor employed M. E. Whitney as a subcontractor to do a certain portion of the work. Whitney earned $67,769.87. The contractor, before the completion of the work and according to the provisions of the contract to be referred to, paid to or expended for Whitney the sum of $60,878.73. This left a balance of $6791.14 in the hands of the contractor. As against this sum, the unpaid claims of Whitney's creditors amounted to $14,681.44.

Elmer S. Hargis, the use plaintiff, rented to Whitney a tractor and equipment which was used in the performance of his subcontract. The Agreed Statement of Facts states that the rental value is the sum of $1710.00, against which there is a set-off of $71.85, leaving a balance of $1638.15. This is the maximum amount of liability of the defendants, if any liability exists.

The contract between the contractor and the subcontractor contained the following provisions:

"Subcontractor agrees specifically to perform the following designated work: Furnish and place 16,700 sq. yds. of 9 inch concrete pavement, furnish and deliver to job site 143 cu. yds. (more or less) concrete mix, all above items to be in accordance with Government specifications and measures as outlined in contractor's prime contract with the Government.

"Payment and Acceptance of Said Work. The total price to be paid subcontractor for said work shall be the unit price of $3.90 per sq. yd., and $12.00 per cu. yd. payable in lawful money of the United States of America, which shall be paid as follows: Contractor agrees to pay all accrued material, freight, equipment rental and transportation charges, payrolls and incidental charges to be deducted from final settlement of total amount due under this contract, provided, however, that 10% of said total contract price shall not be due and payable until 35 days after the actual completion of contractor's contract, and acceptance thereof by the owners or their agents. And it is further agreed that the unit price of 380 ft. of double conduit shall cost $1.05 per ft., also that the contractor shall add to the amount of the total weekly gross payroll 6.685 per $100.00 to cover accrued workmen's compensation insurance, social security taxes and deductions, plus 5% handling and bookkeeping charges, also that the final payment shall not become due until 35 days after the actual completion of contractor's contract, and acceptance thereof by the owners or their agents."

The following facts are also stipulated in conjunction with the clause just quoted, which are contained in Paragraph IV of the Stipulation.

"Ruddy and Son, did in fact, pay directly for all labor upon the job carried on said Whitney's payroll, and did pay for all other materials and other services rendered to said Whitney in connection with said job, insofar as any payment was made. It was the custom and the practice of Whitney to present the bills of his suppliers to M. J. Ruddy for his approval. On or about the 15th day of February, 1944, the subcontractor wrote to the plaintiff stating the gross amount of plaintiff's bill in the sum of $1710.00, which was the total of the amount of bills that had been submitted to the plaintiff by Whitney up to February 15, of 1944. The subcontractor Whitney made a charge against Hargis in the sum of $71.85 for certain oils, greases, and service to the tractor, and claimed that the net balance due to Hargis was $1,638.15."

The Agreed Statement of Facts contains the following reservations:

"That by entering into this stipulation, the defendants do not concede the materiality of the matters set forth in paragraphs 4, 8, 9, 10 and 15 hereof, but contend that said matters are immaterial and irrelevant and should not be considered by the Court.

"That the matters set forth in paragraph 4 hereof are included only for the

purpose of explaining the procedure followed by M. J. Ruddy and Son in making payment for the benefit of the subcontractor, M. E. Whitney, and for no other purpose."

In view of this reservation, it is necessary to set forth the paragraphs so numbered other than Paragraph IV, which has already been reproduced. They read:

"VIII. That plaintiff also received a carbon copy of a letter, dated May 4, 1944, on the letterhead of M. J. Ruddy and Son, addressed to Herman E. Weigis and the Fidelity and Casualty Company of New York, containing a notation at the bottom: 'cc: Copy to Mr. Whitney's creditors on Job No. 5584.'

"IX. That plaintiff received a letter, on the letterhead of M. J. Ruddy and Son, addressed to M. E. Whitney, dated May 9, 1944, signed by Aubrey H. Y'Blood, Office Manager, containing a notation at the bottom 'cc: Elmer Hargis, 130 West Foot-

hill Blvd., Monrovia, California,' in which he stated that the invoice of Hargis, dated April 1, 1944, in the amount of $2281.00 was transmitted to M. E. Whitney and asked for Whitney's approval to pay.

"X. That under date of May 9th another letter was sent from M. J. Ruddy and Son to the plaintiff requesting plaintiff's approval as to the charge contained in the letter of M. E. Whitney to the plaintiff herein, dated February 15, 1944."

"XV. That one Mr. Moore, who was the Superintendent for M. J. Ruddy and Son on the Muroc Job, had knowledge that the tractor was working on the job, and also knew the agreed rate that was to be charged for said equipment."

The three invoices attached to the complaint and the letter of May 9, 1944, addressed to Whitney, another letter dated May 18, 1944, and the telegram of March 30, 1944, are also reproduced in full.

"Invoice
Elmer S. Hargis
130 West Foothill Blvd., Monrovia 7014
Monrovia, California

Caterpillar Diesel Le Tourneau Service
Equipment Rentals Parts Supplies Repair Service
Sold to M. E. Whitney — M. J. Ruddy & Son Date January 24, 1944
Box 32 Our Invoice No. Moore and Whitney
Muroc, California Your Order No.

| Quantity | Part No. | Description | Price | per | Extension |
|---|---|---|---|---|---|
| | Two Months Rent on D6 Caterpillar at | | $410.00 | | $820.00 |
| | " " " " Single Drumm Unit | | 50.00 | | 100.00 |
| | " " " " Bull Dozer | | 110.00 | | 220.00 |

Maintenance and Repair Per Hour Less
Operator Furnished by Whitney & M. J. Ruddy
& Son     285 hours at 2.00 per hour                                    570.00
                              Total Due                              $1710.00"

"Invoice
Elmer S. Hargis
130 West Foothill Blvd., Monrovia 7014
Monrovia, California

Caterpillar Diesel Le Tourneau Service
Equipment Rentals Parts Supplies Repair Service
Sold to M. E. Whitney — M. J. Ruddy & Son Date January 24, 1944
Box 32 Our Invoice No.
Muroc, California Your Order No.

| Quantity | Part No. | Description | Price | per | Extension |
|---|---|---|---|---|---|
| 1 | | Starting Engine Air Cleaner | | | 12.00 |
| | | Lost when Ruddy & Son picked up tractor | | | |
| | | at Monrovia, California." | | | |

"Invoice
Elmer S. Hargis
130 West Foothill Blvd., Monrovia 7014
Monrovia, California

| Caterpillar | | Diesel | | Le Tourneau Service | |
|---|---|---|---|---|---|
| Equipment Rentals | | Parts | Supplies | Repair Service | |

Sold to M. E. Whitney — M. J. Ruddy & Son    Date 4/1/44
    Box 32    Our Invoice No.
    Muroc, California    Your Order No.

| Quantity | Part No. | Description | Price | per | Extension |
|---|---|---|---|---|---|
| | | Invoice on January 24–44 | | | 1710.00 |
| | | ½ month's rent after Jan 24, 44 up to Feb 7 | | | |
| | | when tractor was returned to Monrovia | | | |
| | | 112 Hours Maintenance and repairs | | | 335.00 |
| | | Jan. 24 to Feb. 4, 44 | | 2.00 | 224.00 |
| | | | | | 2269.00 |
| | | Starting engine air cleaner | | | 12.00 |
| | | Total for rent on D6 Tractor at Murdoc | | | |
| | | Air port | | | 2281.00" |

"M. J. Ruddy & Son
"General Contractors
"Modesto, California
    "May 9, 1944
"Mr. M. E. Whitney
  "2999 Carmen
  "Fresno 4, California
"Dear Mr. Whitney:
  "Enclosed is invoice of Elmer S. Hargis dated April 1, 1944, in the amount of $2281.00. If this invoice is in line for payment, kindly give us your approval to pay.
  "On May 1st we asked for an itemization of the item of $14,554.48 which you authorized us to pay in your letter dated March 6th. Mr. Hargis's item of $2281.00 may be in that list and I would appreciate if it is at all possible for you to furnish this itemization at once.
  "Yours very truly,
    "(Signed) Aubrey H. Y'Blood
      "Aubrey H. Y'Blood
"AHY:ff        "Office Manager
"encl.
"cc: Elmer Hargis
  "130 West Foothill Blvd.
  "Monrovia, California"

"M. J. Ruddy & Son
"General Contractors
"Modesto, California
    "May 18, 1944
"Elmer S. Hargis
  "P. O. Box 450
  "Monrovia, California
"Dear Mr. Hargis:
  "The check the writer virtually promised to mail today is going to be further delayed.
  "The USED office in Los Angeles called us again this morning with reference to the Whitney matter. Mr. Moore and myself plan to visit with the USED either Friday or Saturday or the first part of next week and all payments of the Whitney creditors are going to be held up at least until that conference is held.
  "We certainly enjoyed your visit and sincerely regret that it did not produce you a check.
  "Yours very truly,
    "(Signed) Aubrey H. Y'Blood
"ahy:ff       Aubrey H. Y'Blood"

"Western Union Telegram

"SF93 24 ' Modesto Calif Mar 30 449P

"Elmer S. Hargis

"130 West Foothill Blvd W J

"Conference being arranged between Whitney the Bonding Co and ourselves for latter part of week as soon as I know the results will advise

"Joe Ruddy
(530P)"

The question turns on the application of Section 270b(a) of Title 40, which reads:

"Same; rights of persons furnishing labor or material

"(a) Every person who has furnished labor or material in the prosecution of the work provided for in such contract, in respect of which a payment bond is furnished under section 270a of this Title and who has not been paid in full therefor before the expiration of a period of ninety days after the day on which the last of the labor was done or performed by him or material was furnished or supplied by him for which such claim is made, shall have the right to sue on such payment bond for the amount, or the balance thereof, unpaid at the time of institution of such suit and to prosecute said action to final execution and judgment for the sum or sums justly due him; Provided, however, That any person having direct contractual relationship with a subcontractor but no contractual relationship express or implied with the contractor furnishing said payment bond shall have a right of action upon the said payment bond upon giving written notice to said contractor within ninety days from the date on which such person did or performed the last of the labor or furnished or supplied the last of the material for which such claim is made, stating with substantial accuracy the amount claimed and the name of the party to whom the material was furnished or supplied or for whom the labor was done or performed. Such notice shall be served by mailing the same by registered mail, postage prepaid, in an envelop addressed to the contractor at any place he maintains an office or conducts his business, or his residence, or in any manner in which the United States marshal of the district in which the public improvement is situated is authorized by law to serve summons."

■ The Act of which this section is a part, known as the Miller Act, was enacted in 1935. It superseded a prior Act known as the Heard Act, 40 U.S.C.A. § 270a note. Concerning it, the Supreme Court has repeated what it had said about its predecessor, i.e., that being a remedial act intended to benefit persons who perform labor or services for contractors on public work, it should be construed liberally to effectuate its purpose. See, Fleisher Co. v. United States, 1940, 311 U.S. 15, 17, 61 S.Ct. 81, 85 L.Ed. 12; MacEvoy Co. v. United States, 1944, 322 U.S. 102, 107, 64 S.Ct. 890, 88 L.Ed. 1163.

■ The particular problem which confronts us here is whether there has been compliance with the requirement of notice of the Section just cited. Such compliance is a condition precedent to the institution of an action by a subcontractor who has no contractual relationship express or implied with the contractor. Fleisher Co. v. United States, supra.

As the work ceased some time between January 24, 1944, and February 7, 1944, the invoices, letters and telegrams referred to, assuming that they constitute notice or waiver of notice, were within the statutory ninety day period.

The defendants argue that they did not amount to notice.

Reliance is placed chiefly on United States v. Northwestern Engineering Company, 1941, 8 Cir., 122 F.2d 600. The Eighth Circuit Court of Appeals held in that case that ordinary invoices furnished to the subcontractor, which he turned over to the contractor as evidence that the work was done, did not constitute notice of claim or "a substitute for the written notice of claim which the statute imposed as a condition precedent to any right of action upon the bond." United States v. Northwestern Engineering Co., 1941, 8 Cir., 122 F.2d 600, 603.

But here we are confronted with more than the mere presentation by the subcontractor of invoices to his contractor. The contract between the contractor and subcontractor specifically provided that the contractor should pay all accrued material, freight, equipment rental and transportation charges, payrolls and incidental charges and deduct them from the amount due the subcontractor, withholding only ten per cent of the total contract price which should not be due and payable until 35 days after completion of the contract and its acceptance by the owner. The

Agreed Statement of Facts does not question the existence of this clause. Nay, more, it states that the contractor *actually paid out* directly for all the labor upon the job carried on by the subcontractor and all material furnished to him.

The reservation in the Stipulation as to this merely leaves it to the Court to determine whether the clause in the contract, the statement of what was done under it and the letters referred to in certain designated paragraphs are material to the determination of the case.

We hold that they are, and that they cannot be disregarded in determining this case. Otherwise, we might encourage dishonesty. For we would be saying that a contractor, who, in order to insure the discharge of his subcontractor's obligations to third-party creditor beneficiaries, assumes them, could repudiate them when he finds that their claims exceed the money value of his own contract with the subcontractor. And this, despite the fact that these persons performed work and furnished materials with knowledge of, and in reliance on, the existence of this very undertaking.

Under the law of California, an agreement of the type under consideration is considered a contract made for the benefit of a third party and enforceable directly against him, although the third party beneficiary is not actually named or is only one of a class of persons mentioned. See California Civil Code, Sec. 1559; California Code of Civil Procedure, Sec. 369; see also, Malone v. Crescent City M & T Co., 1888, 77 Cal. 38, 18 P. 858; Chung Kee v. Davidson, 1894, 102 Cal. 188, 36 P. 519; Washer v. Independent M & D Co., 1904, 142 Cal. 702; Garratt v. Baker, 1936, 5 Cal.2d 745, 56 P.2d 225; Hartman Ranch Co. v. Associated Oil Co., 1937, 10 Cal.2d 232, 73 P.2d 1163—a case in which, in a per curiam opinion, the Supreme Court of California reviews all the decisions on the subject and adopts the more liberal view which the preceding cases have expressed. And see, Woodhead Lumber Co. v. E. G. Niemann Investments, Inc., 1929, 99 Cal.App. 456, 457, 278 P. 913; Mannon v. Pesula, 1943, 59 Cal.App.2d 597, 608, 139 P.2d 336; see also Langmaid: Contracts for the Benefit of Third Persons in California, 1939, 27 California Law Review, 497.

While there is conflict of opinion elsewhere, the trend is towards the broader view, especially when dealing with creditor-beneficiary rights. See 12 Am.Juris., Contracts, Secs. 274-289.

■ In interpreting specific obligations under a Federal public works statute, such as the Miller Act, we are governed by federal law. However, when we discuss agreements between a contractor and subcontractor, the rules of interpretation which obtain in state courts, in general, are not only persuasive, but, *in the absence of direct federal rulings to the contrary,* may be adopted as proper criteria for adjudicating the rights of parties.

■ It is to be noted that Subdivision 270b(a), in speaking of persons having direct contractual relationship with subcontractors, uses this modifying clause, "but no contractual relationship express or *implied* with the contractor" (emphasis added). Implied contracts have long been recognized in law. McDonald v. Thompson, 1902, 184 U.S. 71, 74, 22 S.Ct. 297, 298, 46 L.Ed. 437, defines implied contracts as "such as arise by legal inference and upon principles of reason and justice from certain facts, or where there is circumstantial evidence showing that the parties intended to make a contract."

■ Much speculation has been indulged in by law writers and courts on the distinction between implied contracts in law and implied contracts in fact. Many have insisted that contracts implied in law are, in reality, constructive or quasi contracts. But all the authorities seem to agree that when the words "implied contract" occur in a statute, the reference is to an actual contract inferred from the circumstances, conduct, acts or relations of the parties, showing a tacit understanding. See, Baltimore & Ohio R. v. United States, 1923, 261 U.S. 592, 598, 43 S.Ct. 425, 67 L.Ed. 816; Klebe v. United States, 1923, 263 U.S. 188, 44 S.Ct. 58, 68 L.Ed. 244; G. T. Fogle & Co. v. United States, 1943, 4 Cir., 135 F.2d 117, 120; 17 C.J.S., Contracts, § 4, subsecs. a and b; Restatement; Contracts, 1932, Sec. 5.

■ The use of this term in the statute under consideration means that a person furnishing labor and materials to a subcontractor can recover on the bond, *without the ninety day notice,* if although not armed with an express contract, he can claim a contract *by implication.* In the last analysis, the legal effect of both contracts is the same. For the distinction lies

merely—to use the words of the Restatement; Contracts, Sec. 5(a)—"in the mode of manifesting assent." And so, when, as in the case before us, a contractor not only agreed in writing to pay certain obligations which the subcontractor might incur in the performance of his subcontract, *but actually did so,* we have, if not a contract made directly for the benefit of a third party, *at least, an implied contractual relationship which calls for recovery on the bond without notice.* For, using the test of the older cases, "privity of contract" exists between the contractor and such persons. Woods v. Ayres, 1878, 39 Mich. 345, 33 Am.Rep. 396, the leading case on the subject.

The Fourth Circuit Court of Appeals in United States, for use and benefit of Noland Co. v. Wood, 1938, 4 Cir., 99 F.2d 80, found liability under similar circumstances by applying the doctrine of estoppel. And the Second Circuit Court of Appeals in United States, for use of W. E. Foley v. United States Fidelity & Guaranty Co., 1940, 2 Cir., 113 F.2d 888, 890, made a like ruling by holding that the notice "is not needed when the contractor has himself entered into an agreement with the materialman of a subcontractor."

It is true that in United States, for use and benefit of Noland Co. v. Wood, supra, there was a written undertaking for payment to a specified third party and in United States, for use of W. E. Foley, supra, there was a written guaranty of an account. But the reasoning of these cases applies with equal force here. For the notice being for the contractor's protection, his agreement to pay and actual payment of the debts of his subcontractor, the receipt by the contractor from the use plaintiff, without objection, *of invoices which named him the debtor along with the subcontractor,* only requiring confirmation by the subcontractor, the subsequent negotiations for the payment of the specific debt, and the letters and telegram sent while they were going on, the assurance that the moneys would be paid, the apology contained in the Office Manager's letter of May 18th, for not sending "the check which the writer virtually promised to mail today"—indicate that the contractor interpreted his agreement with the subcontractor as *a direct obligation to pay.*

When to this we add the fact that the contractor's superintendent on the job knew that the tractor was being used and the rate charged for its use, it is quite apparent that the contractor had *actual notice that the work was being done.* And, *after it was done,* he had before him a claim directed to him, *jointly with the subcontractor,* stating specifically and "with substantial accuracy the amount claimed and the name of the party" to whom the equipment was rented.

So that the factual situation before us discloses a direct contractual relationship between the use plaintiff and the contractor, and such acts on his part in inducing reliance by third persons, as spell liability—whether we resort to the theory of third party beneficiaries or to the doctrine of estoppel, or hold that the contractor's conduct indicates such complete knowledge of all the elements of the claim, as would have made a more formal notice an idle and useless act. See, United States ex rel. and for use and benefit of Korosh et al. v. Otis Williams & Co., 1939, D.C. 30 F.Supp. 590, 593, opinion by Judge Cavanah. In requiring that written notice of claim be given to the contractor, and *not to the bonding company,* within a definite time, the statute seeks to protect the contractor by making it possible for him to withhold moneys due to the subcontractor, in order to satisfy claims asserted by third persons.

It does not prescribe the form of notice.

Here the contractor not only knew that the equipment was used in the execution of the work, but, through invoices and other written documents, had all the details of the claim and, in his negotiations with the use plaintiff, through his Office Manager, showed that he had received as accurate information about the claim as could have been supplied to him by the most involved legal jargon which a technical lawyer might have put into a formal document.

In sum, the agreement between the parties, its contemporaneous interpretation by them, and their actions with relation to it, made any additional notice unnecessary.

Judgment will be for the plaintiff in the sum of $1638.15.